Next case for argument, Fall River Rural Electric Co-operative v. FERC. Petitioner, Fall River Rural Electric Co-operative, I'd like to reserve three minutes of my time for rebuttal. Initially, Your Honors, I need to correct an erroneous statement in my reply brief, which was unintentionally unfair to FERC. My reply brief stated that FERC's brief did not address our argument regarding whether or not PPL Montana had consented to an alteration of its license. In reviewing the case more thoroughly in preparation for this argument, I realized that FERC's brief did briefly respond to that, and the last two pages of its brief did not address it as a stand-alone argument, but it did mention it, as I say, on pages 34 and 35 of their brief. And I apologize to the Commission as well as to Your Honors for that. This case is before the Court because the FERC has dismissed Fall River Rural Electric Co-operative's application for a license. And I wish to emphasize that FERC dismissed the application. They did not decide the application on the merits. They did not deny it on the merits. Rather, they dismissed it. The Commission's orders are not entitled to deference by this Court for two essential reasons. The first is that the Commission's orders are very fundamentally inconsistent with prior Commission cases dealing with alterations of an existing license. The second reason it's not entitled to deference is because the Commission's orders are not supported by the record evidence in this case. So what standard of review do we use with regard to reviewing the FERC decision? The standard review is whether the Commission's orders are based on substantial evidence, Your Honor, as well as did the Commission engage in reasoned decision-making. And because their orders are not consistent with their prior cases, I submit to the Court that the Commission's orders do not reflect reasoned decision-making. This Court has recognized the standard of deference entitled to agencies, and it has in the Lockyer case recognized that Chevron does not require blind deference to the agency. The Supreme Court in the United States v. Meade made a very pertinent comment for guidance in this case, which is the fair measure of deference to an agency must look to the degree of the agency's care and its consistency, and in addition to other factors. But those two factors in particular are important to this case, because the Commission's orders are not consistent with prior orders, and its lack of care is demonstrated by the lack of factual evidence in support of its decisions. First, FERC's orders are a marked departure from prior cases. That's what you say. Could I help you focus your argument there? What they seem to be saying is that there are two components, as I understand it, to what they said. One, there were some physical alterations, and there were some operational impacts. On the physical alteration side, it's hard for me to go back and look at FERC opinions and determine whether any physical alteration is what they equate with a substantial alteration. So could you address whether that alone would be enough? Enough to sustain FERC or enough to reverse them, Your Honor? Well, you say they're inconsistent with their prior decisions. Right. I'm just trying to understand. Okay. It appears to be that if what is being proposed requires a physical modification of the — and I may be misunderstanding the cases, but there's a physical modification that that then pretty much is what they need to find to justify their decision. They need to find more than just any physical modification, Your Honor. Under the Pacific Gas and Electric case, as well as a number of commission orders we've cited, there needs to be a substantial alteration to the license. And the PG&E court made very clear, as has the commission, that a minor alteration is not enough to prevent a new license from being issued to a new applicant. And they found that what was being done here was substantial. They did, Your Honor. And that, I submit, is not based on the evidence. You are correct. There are two elements to an alteration. What was the alteration in the Pacific Gas and Electric case? I'm sorry? What was the alteration in Pacific Gas and Electric? The alteration in Pacific Gas and Electric, Your Honor, was an increase in the tailwater of the existing project, which was owned by Pacific Gas and Electric, and the effect of that, because it reduces the head, the flow over the dam, which goes into the pen stack to turn the turbines, it reduced, it diminished Pacific Gas and Electric Company's power generation. A very small amount. It only reduced it by three-tenths of a percent. But nevertheless, it reduced it. Fall River's project here will not have any effect. And what was the physical alteration? It was an increase, due to the new project, which was being built by Calaveras County Water District, and it was a large project, their impoundment would raise the elevation of the water in the tailwater of PG&E's dam. That was the physical alteration. We've got a tailwater problem here, too. Pardon? You have a tailwater problem here with the proposal. We have a tailwater problem, but it's not a matter of raising the tailwater, Your Honor. You're never going to find two projects going to have exactly the same thing. It's the effect and what deference we have to give to the judgment making that effect. Now, in this case, as I understand it, and make sure I'm right, the original conduit deposits the water above the river level, causing aeration, which is necessary as part of the license for PP&G. Is it PP&G? PP&L, Montana. Yeah, TG&L, whatever. Anyway, they need that drop in order to maintain the aeration that's conditioned to their license. When you put in the new penstock and the new power plant, it's going to release the water from the power operation underneath the river level. That way it doesn't – excuse me? Part of the water. Part of the water? Yeah, that's why there's a bifurcation. Excuse me? That's why there's a bifurcation, Your Honor. The water. I didn't find – that must be an operational problem then because you've got the penstock and you've got the valve that can run the water to the penstock to the powerhouse or through the original conduit or down the conduit old path. Right. Who's going to decide that? The commission would if they address the merits. No, no, no. Who's going to decide how to turn the valve? Well, Fall River Ward in conjunction with PPL, typically the commission – That's why the cooperation agreement is necessary because if Fall River wants to make money they're going to divert it all through the powerhouse. Typically the commission will require the two parties to get together. They will license the project. Exactly. But after the license is issued, Your Honor, that's what they did in Weber Basin. We're going to give them the license and then we're going to worry how to operate it. That's what they did in Calaveras County. That's what they did in Weber Basin. That's what they did in the fluid energy case as well, Your Honor. Well, if there's no significant impact or no significant modification. Right. In this case, you're just arguing upstream, if you will, that there is no significant modification. So you can worry about those details later. Well, the DO – The commission didn't find that, though. But the DO issue, Your Honor, which you raised, was addressed in the evidence, and the only evidence says that there is not going to be a DO issue. We'll let counsel argue. I don't know. I know that there was some issue, and it seemed to me that there was an issue that was taken in consideration by the commission when they said there was an alteration that would make an effect on the original PPNL license. Right, right. There were four changes to the – to go back to questions you've all asked. There were four essential changes that would be affected by Fall Rivers Project. One is the conduit where the Fall River would propose to, in effect, reinforce the conduit. They would not change the dimensions of it. The second one, Your Honor, is the one – Well, I think the dimension is a little bit changed because they're going to slip a steel pipe or a steel conduit, and they're going to put reinforced concrete. So to a certain degree, it's going to be reduced. I don't know if that makes any difference in the flow, but that's what they're going to do. Right. It's not – yeah, I do not believe it will make a difference in the flow. The second change, of course, is the one that you identified, and that is there will be the bifurcation valve, which will take some of the water and put it into Fall Rivers Project, and then that water would be released under the tailwater. It would be released in the tailwater, not way downstream. Your operable word is some. I mean, if – I assume if you're going to run the powerhouse, it may be geared to the fact that it will take the full flow. It's going to go as the river flows. So you're going to want to take the full river if you can. Well, we'll take – we're only going to – Fall River would only take what PPL Montana releases anyway. The difference is when it hits that bifurcation point, they would then take some of it to divert into the powerhouse. But they could take all of it? I'm not sure, Your Honor. So as I understand the flow here, there's a bifurcation. You're saying some. It could be all if the release from the dam is for whatever conditions exist. I believe it could be depending on what conditions the commission would put on a license if they issued one. All right. But to the extent that you are then eliminating – that is diverted, you're not getting the aeration from the drop in any event. Does that – how do we weigh that? What are we supposed to decide in second-guessing the FERC's conclusion, which you say isn't supported by evidence? But how do we know – what are we supposed to say that says that that is a wrong conclusion, that the aeration drop or oxygenation is potentially negatively affected? Here, your question goes to the heart of this case. I always like to do that, right to the heart of it. I miss it a lot. The reason I say that is we're not asking this Court to direct the commission how to decide the case. The problem is the commission did not decide the case on the merits. They dismissed it out of court. It relied on the objection of PPL. I'm sorry? It relied on the objection. Right. But it didn't get to the point of making a decision of how much of that water could be used for Fall Rivers Project versus how much still should continue to be used for the aeration, which Your Honor has pointed out. That is all we're asking this Court to do, send it back to the commission to make a decision on the merits of the license proposal. You don't want to do that, do you? Pardon? You're asking them to amend the license of PPL. That flies right in the face of your rights. That would be the effect of it. Yeah. Isn't that a substantial alteration? You're telling in order for you to use the river run, whatever it may be, you're saying we have to go back and tell the commission to alter the prior license. That's the whole point, not to do. I'm not quite asking you to do that, Your Honor. Well, you're saying so because I think that valve is very important. Let me see where I'm going wrong here. If, in fact, you're going to put a powerhouse in, you're not going to put in three drops of water in it. You're going to want to work the powerhouse to make it economical. Correct. So my guess is, and I don't know if it's in the record, you're going to want the valve wide open. So if there's half a conduit, you get half a conduit. If there's full conduit, you get a full conduit. Now, if you're going to design a little bitty powerhouse to produce no power, then I don't see that in the record. Now, if that's the case, you're going to have to talk to PP&L because they are the ones that control the gates, they're the ones that control the flow, and they're the ones that have to be responsible for the aeration. And that requires an agreement. So then you have to go upstream, if you may, and you have to talk about substantial alteration because the only way you can go where you're going, you've got to say they made a mistake on the substantial alteration. That way you can solve all these problems backside. But the commission has solved it, Your Honor, in other cases while issuing a license by directing the new licensee to enter negotiations. They can't do it if they find a substantial alteration because the statute requires that you have the consent of the two licenses. If it's a substantial alteration. That's what I'm saying. So you have to address the substantial alteration issue. Right. Right. The reason I don't believe that it is a substantial alteration is because the commission in the prior cases has not found similar situations to be substantial. I understand. You're talking about Niagara and the rest of them, and you're just saying you're different. Right. You're saying that what they did in looking at those facts and applying them to your facts, that they made a mistake. Correct, Your Honor. For instance, in Niagara, Niagara had three major changes, which the commission talked about in its orders and talks about in its brief. One of those was a change to the headgate structures. And I made a mistake in my brief that hurt me on that one because we are not changing the headgate structures. We're only changing the intake to the structure to the water release. Number two, Niagara Mohawk involved dam abutment repairs. There's none of that involved here. You're going to dig into the foot of the dam in order to put in the valve and the penstock to go to your powerhouse. Correct. They approved that kind of a situation in Weber Basin where they not only dug into the dam, but actually they dug into an existing licensed penstock. The Fall River proposal is more benign than that. Weber Basin was just a canal. It had nothing to do with the dam. They just put a penstock underneath the canal. Right, but they had to open up the existing licensed canal. I know, but there was no dam there. It was just an eight-foot-by-eight-foot section of a licensed canal. That's a little bit different than this dam. But I would suggest, Your Honor, what the commission should do and has done in the past is look at the effect after the construction because Fall River would completely fill back in and revegetate the dam. That part of it would not even be noticeable afterwards. Can I ask you a technical question? Penstock, what is a penstock? A penstock is simply a water conduit, Your Honor, which runs from the water reservoir down into the turbine because you can't grab the water as it's going over the dam. I understand. So that's the penstock. Right. Big pipe. Pardon? Big pipe. Big pipe, big water pipe, exactly. Okay. Do you want to save the rest of your time? We've got a little under four minutes. I'm sorry? You have a little under four minutes. Yes. I would like to save a little bit of time. I want to talk before that. I'll save three minutes, Your Honor. Thank you. I want to mention the other two cases the commission has relied upon were JDJ Energy and Green Island Power Authority. Green Island Power Authority proposed a complete decommissioning of an existing licensed project because the new impoundment would completely inundate the existing project. That case actually has no relevance to our case, and I suggest the commission cannot rely on that one. JDJ Energy also involved construction of a new powerhouse that would substantially modify an existing powerhouse, and Fall River's proposal does not do that. So those are the three primary cases FERC relied on. Thank you, counsel. Good morning, Your Honors. Beth Possella for the Federal Energy Regulatory Commission. It seems from Your Honor's comments this morning that you understand essentially where the commission, what the basis of its holding was, and I don't know if you have any particular questions. I'm a little puzzled because there is a mandate to make the most effective use of this natural resource, and essentially what's happening here, if you take the Fall River's position, they have a beneficial use of this natural resource. They have to get the approval and cooperation of the existing licensee. There's no doubt about that. And the existing licensee didn't step up and object at the beginning of all of this process. It looks like there may have been a change in management or something that comes along, and all of a sudden late in the process is a resounding no, we don't want to do it. So I'm troubled by what seems to be a prevention of what would otherwise appear to be a modest modification of the facilities there. There is a degree of speculation on the operational side. And I'm not exactly clear just how much the physical side really does constitute what I would, you know, if it's a material. Yes, there's some physical changes, but are they material? And so that's, if you could give me some reassurance along those lines, I'd feel a lot better about it. I'd be happy to, Your Honor. Let me start first with explaining that the obligation to obtain the existing licensee's consent is the proposing licensee's. It's not anyone else's burden to do that. All right. But there's a doctrine in, you know, in law somewhere about, you know, not unreasonably withholding consent. So there's a certain good faith dealing, and I'm not sure where that comes in here. I don't believe that there's jurisdiction to address that particular issue here. Below, before the commission, the way that the Petitioner raised the issue of they led us along and didn't consent, that was raised as an antitrust violation claim. Well, no, I understand it. Right. So FERC is just captive to whatever the licensee says? If the licensee says no, then, you know, FERC closes up and leaves? Actually, yes. As long as it's a substantial alteration, Your Honor. That's the point. Right. Okay. As long as it's a substantial alteration. Let's talk about whether or not there really is a substantial alteration. On the physical alteration side, the commission pointed to a number of alterations that were proposed, including going directly into the guts of the dam and relining and regrouting the dam. Something that PPL itself had thought might be a good idea previously. Only when it was considering originally in its own relicensing, which was approved in 2000, that it might have generation added at this portion of its project. And it determined that it wasn't economic to do so and dropped that. So they go into it, and so what's the negative effect of that? But let me explain first that it was completely unnecessary. The project was going along swimmingly, and the Petitioner agrees with that. This was this relining and regrouting was being done solely because of the generation, that there would be too much force. The question to me is why? So what? So they did it. So what? Does it have any adverse impact on the operation? That's one of the factors the Commission pointed to. And what they said is, again, they're going into the bowels of this dam, and they're relining it. So that innately is an adverse impact. You have it working perfectly as you want it. It's as if someone comes in your house and redecorates just because maybe it ends up looking nicer. It doesn't mean it's not offensive to you that someone comes in and redecorates. Well, is that it? It's offensive to relicensees? Well, we're talking about an adverse impact. And, again, that's not the only thing the Commission relied on. The excavation of the large area of the dam that would be required in order to bifurcate and have the water be diverted, which, again, causes physical problems. That's a physical alteration in and of itself, but also cause potential real operational problems as well. Again, as an independent matter, those are independent holdings. So any time that a proposed project will make any physical alteration, that's enough? No. This is actual excavation of a large area of the dam, which was necessary to bifurcate, and installing the valve house and the penstock, which I didn't actually know exactly what a penstock was before. We all learned something. I did learn that today. So we shouldn't defer to FERC's expertise. No, no, my expertise. I'm sure FERC knows what that is, but that wasn't a big issue, what it was. The point was that it would be installed there, and it would require excavation of the dam itself to get to it. It's an earth-covered dam, so in order to get to it. I wish I had seen pictures of it. You haven't seen pictures of it? Yeah, you can go on Google and see pictures of it. I wish I had thought to do that. Because it's not in the record. On top of that, and what the commission said specifically at ER 637, paragraph 15, is that although the construction activity would be temporary, the physical changes to the existing structures were not minor. So the commission understands that the excavation. That's a conclusion. Okay. That's a conclusion. But that's its conclusion, that this is substantial because. Because they're not minor. Because they're not minor, and you're digging in, and, yes, that's all during a construction period. But what's left behind is not a minor alteration. That's the commission's specific finding. On the operational side, as a wholly independent matter. Well, before we leave that, first of all, what is our ‑‑ we're looking, this is an appeal under the APA, so it's arbitrary and capricious or otherwise it's not in accordance with law. That's right, Your Honor. When they dig into the dam, let's not discount this penstock so fast. We're going to dig into the dam, into the base of the foot, go way back in the dam, and we're going to put in a valve, a big valve. That's right. And a valve house so that the flow of the river that goes out that conduit can be diverted wherever they want, all the way to the powerhouse, all the way down to the river as it went before. And the operation of that valve is going to have to be determined because ‑‑ That's exactly what I was about to get to. That's right, Your Honor. So that is substantial. I mean, this is not ‑‑ I'm saying, I can't remember the size of the penstock, but it was 15 feet, 20 feet in diameter or whatever. It's a huge piece of pipe. And so does the size of it or the valve or the digging have anything to do? Because counsel says, heck, we're going to cover it up again and re‑vegetate it. What's the big deal? So how do we look at whether that's substantial or not? Is it because it's sizable? Is it because it can alter the flow of the conduit significantly? Surely the operational side, which I was going to get to, which is, again, a separate holding from the physical side, although they are, of course, related because it's the physical alterations that cause the operational concerns. The commission talked on that side about three concerns. One is only during the construction period, and that involves the ability to meet minimum flow requirements while flows are being sent over the spillway instead of through the intake. I found that kind of interesting because I think that what I got out of that is there's no backup. In other words ‑‑ At some point you've got the regular intake structure and the water goes there. If something goes wrong, it can go over the top of the dam to the spillway. That's exactly right. If you modify the spillway and something happens, I mean modify the intake towers and it's going over the spillway, there's no backup. That's right. And the minimum flow requirements in PPL's existing license are critical. This is a major fishery area, and you need the minimum flows to meet all kinds of mandates in the existing license. So it's not a small matter. It's not a small concern. Does that mean that the flow over the spillway is uncontrollable where the flow through the intake tower is? I think what the commission's concern more, again, on that specific point was you don't have redundancy, which is what Your Honor was talking about. They were talking about the gates. Over the spillway it would go through six gates, and if there's something that goes wrong with these gates that are manually operated, then you can't meet your minimum flow requirements. And PPL not only had a flow requirement, but an aeration requirement. That's exactly right. And that was the commission's second point. And this is a permanent concern. This is ongoing throughout the entire period of the license. And it's a real problem that not might occur, but would occur, because we all know that a portion of the flows are now going to be diverted through this bifurcation. And those flows are not, instead of all flows going over, falling from the top and going through the air and then re-aerating and having sufficient dissolved oxygen levels so that fish can live, that's now going to be at least lessened, if not greater effect. When I asked counsel, he indicated that you wouldn't lose all of that drop or aeration after it gets through the powerhouse. What's your understanding? I think he's right, assuming that the joint use is working well. Again, as Your Honor was bringing up. I understand that. I mean, if it comes out of the powerhouse, does it come out underneath the river, or does it come out so that it can drop? As the commission explained, now the water falls from the level well above the tail water and comes into the contact with the air. But re-aeration would be reduced or eliminated because water would be diverted from the conduit into the turbine and released below. So you're right, Your Honor. It would be released below the turbine instead of as it was before. Because the release box now is a concrete box high that drops it down. That's right, Your Honor. And that's at hearing order ER-638, paragraph 19. So this is a real concern of an existing license requirement that is there for a reason. It's also a ---- Am I correct that the ---- even if this powerhouse went in, that PPL would control the flow? I mean, they would control the river according to their license. And all that the powerhouse would take is whatever comes through this conduit. Yeah, I mean, again, what happens at the bifurcation, whoever is going to, again, the joint use of this area and they're controlling the valve and so the water is flowing, I think that is something that would be ---- Well, that was my point earlier is if they control the gates up above and you have two intakes, now you're going to open up all four. So if they open up all four and then they have to make an agreement about how you're going to divert the water at the valve at the Y. And that was never ---- and counsel says, well, don't worry about that, the commission can worry about it later. But it's not something you can worry about later because, again, Section 6, the whole basis of it is that the comprehensive development of the river is going to be done through personal financing. And so in order to get people to finance projects, they need to know that they're going to have sanctity of licenses. And that's critical. And that's why the commission is bound in a situation like here where you're going to have installation of gates and you're going to have alterations to the dam outlet conduit itself and you're going to have operational concerns. This is a circumstance that involves substantial alterations and does require the consent of the petitioner, of the existing licensee. On the operational dissolved oxygen concern, I just want to point the court to SD The court does spend a bunch of time explaining at 1853 the importance of dissolved oxygen in order to keep fish alive. And, again, the third concern that the commission had regarding operational matters was that minimum flow requirements on a permanent basis would not be able to be retained because of potential fish entrainment. And as petitioner's own license application admits at ER 152, fish is passing through turbines may experience injury or death due to a variety of causes, and they discuss six of them. There is no turbine now at this project area, and there would be afterwards. So this entrainment issue is a brand-new issue. And I think, finally, on the dissolved oxygen issue, I did want to also point out Petitioner in its brief at here as well points to a study that it did during the licensing process, the preliminary permit and licensing process. That dissolved oxygen study they do is just during construction period. It had nothing to do with during the actual license operation itself. It was just whether there would be a dissolved oxygen concern during construction. And that study did show that there would not be one during construction. But this is a wholly different matter. This is dissolved oxygen concern during operation of the project itself. Which assumes that the water would be diverted in sufficient amount to eliminate any water drop because it's all being diverted to the power station? I don't think for the commission's concern to be legitimate. It has to be that everything's basically what it comes down to is there's a DO level requirement in the existing license, and that's based on the flows that are happening now, getting this reaeration and having appropriate DO levels. And you don't need to have full diversion for that not to be met anymore. The commission was saying we're not sure 100 percent what's going to happen here, but because it's going to be under the tailwater, we're not going to have the reaeration we had before, and we have a real concern that DO levels are not going to be met. They're concerned about the operating agreement because you can be in the meeting with the powerhouse people, say I want all the water, and PP&L says you can't have it. And so you can and can't try to negotiate an operating agreement under those circumstances. They said there's a problem there. Competing licenses. Now two entities have rights to the same waters, and existing licensee expectations are not being preserved. And that was the commission's concern here. Thank you. Thank you. Just a couple of points, Your Honor. In terms of don't worry about it now, as you put it in a very apt description, the commission in Calaveras County, Fluid Energy Systems, PUD of Grant County, and Howard Baylor did say we're not going to worry about it now. We're going to issue the new license even though there is a minor encroachment, and we're going to direct the two parties to negotiate it and figure it out. And if they don't figure it out, then they're going to come back before us and we'll decide it for them. Did they find a substantial alteration in those cases? No, they did not, Your Honor. That makes a difference. I'm sorry. They didn't find a substantial alteration with respect to the certain of the matters that they licensed. They did on some other aspects of it. Is it your point that you can't rely on the operational issue as a substantial alteration? Yes, Your Honor. Were you here when I said let the judge ask the question? I was. Okay. You'll always get a chance to answer the question, so don't let the clock drive you into interrupting the question. Okay, my question is, are you arguing that you can't call operational difficulties that could be resolved through a cooperation agreement under FERC's aegis, make that the substantial alteration? That's my reading of the Commission's prior cases, Your Honor. Thank you. They never addressed it quite that way, but that is in essence what I am saying. Okay. Thank you. Then I misunderstand the law. I thought if there was a substantial alteration, it requires the consent of both of the current licensee and the potential licensee. Correct, Your Honor. And if there is a substantial alteration and the existing licensee does not agree to it, then the Commission is not going to license it. Okay. Absolutely. The second point I'd like to address briefly is the entrainment issue. The entrainment issue was raised for the first time by the Commission on the rehearing order, and that was one of the so-called operational impacts that the Commission identified, and what they said is that screens might be necessary to require finer screening due to potential fish entrainment, and that finer screening, in turn, could affect their flow retirement. That is completely contrary to the record evidence because the State Fish and Game Commission said that the whole issue of screening is much ado about nothing, to quote them directly. So the Commission's reliance on that is completely unsupported in the record. Similarly, with respect to flows for release during the construction period, which was one of the other operational impacts they talked about, they said if PPL slide gates can't operate during the construction period, their ability to meet flow requirements could be affected. Again, that is pure speculation. There's nothing in the record to support it. And by the way, if PPL slide gates didn't operate correctly, PPNL would be in violation of their license. It's the Commission and PPL's responsibility to make sure that license is operating correctly. There's no evidence that it wouldn't operate correctly. Thank you. I see my time is up. Thank you, Your Honor. The case just argued will be submitted. The final case of the morning.
judges: Reinhardt, Brunetti, Fisher